which is Hunt v. Clark, actually Hunt v. Davis. Good morning, and may it please the Court, my name is Jim Jellison, I represent the Navajo County. I am going to reserve two minutes and I understand that that's my responsibility. People in our Arizona communities want to be able to hear from their community leaders when matters of public importance, things that they care about are occurring within their community. And when we look at this case, it stands out among all other cases that I've reviewed that deal with ratification, post-incident ratification, is that based on the district judge's ruling, this case is limited to post-incident ratification only. So what does a county sheriff do? What does a chief of police do if they want to make a public statement that praises what their law enforcement officers have done, but run the risk that if they say something positive about what they've done, that they are going to become individually, constitutionally liable if at some point later some defect in an underlying decision or underlying aspect of an investigation is uncovered? We train our sheriffs and our chiefs on how to deal with the media. This case and its decision could have a wide impact going forward on what we do, on how we train them. Because if an innocent statement or a post-incident statement is going to give rise to individual constitutional liability, it's really going to result in a rule that if you don't have anything bad to say, chief or sheriff, don't say anything at all. Because the risks to you personally and individually are just far too great. Sir, so is your position that post-incident ratification can never lead to individual liability? That is my position, and it's particularly bolstered after the 2009 U.S. Supreme Court decision in Ashcroft v. Iqbal, a decision that has really a wide application to this case in terms of how facts are assessed in the sense of plausibility, but also in the counter to Iqbal's argument that acquiescence, knowledge and acquiescence alone are enough to impose supervisory liability. And they said, no, no, it's not. Absent vicarious liability, supervisors are only liable for their own misconduct. And I think that term, misconduct, is important there because it's going to implicate, you know, some type of wrongful act. That is my position. No, I'm just listening. Okay. No, I'm going to follow up, but you go ahead. No, and that decision is consistent with the Ninth Circuit's language in cases like Taylor v. List and Maxwell, where the court or this Court also says that for a supervisor to have individual liability, they have to have either participated in the unconstitutional action. They would have to have ordered or required the unconstitutional action to be taken. Or they know that a violation is occurring and they fail to prevent it. Well, how about if in this case the sheriff, Sheriff Clark, knew about the deficiencies in the warrant, knew all about that, but nevertheless made the statement that he made, the one that's at issue here afterwards. Is that enough? You know, I love that question because there are, you know, there are some cases that deal with that, but again, you know, I think post-Iqbal, it really isn't. And I say to myself, where's the causation here? Because ever since Section 1983 came back to life with Monroe v. Pate, we've had U.S. Supreme Court cases like Monell, U.S. Supreme Court cases like Rizzo v. Good tell us that causation is a cornerstone of the Ninth Circuit has adopted that through Jeffers v. Gomez. You've got to have causation. So where is the causation when you have a, you have post-incident ratification for, for an act that is, has been completed already? But that wasn't the question that Judge Montgomery put you. The question was if Clark knew before the warrant issued of the deficiencies in the warrant affidavit and then took no action and then ratified what Hunt did, put that, that's the question she put you. Now answer that one. And I, I may have misinterpreted it because I thought the question was what if he knew, what if he knew before he made the statement, not necessarily before the warrant. Answer both. I think they're both good questions. But yes, let me answer that. Let me answer that question because that's a different case and that, that, that may raise different theories of liability like failure to intervene. And that's where I think this case is so interesting because we have a district judge and the district judge order that literally went down the list of alternate theories. There's no plausible claim of personal participation. There's no plausible claim of, of fostering a policy or custom. There's no plausible claim of, of failure to train. There's no plausible claim of, of intervention. If you look in the record at Dock 47, ER 7 through, through 9, you're going to see the judge go through those litany of things. You know, we, we look at the Lara's case, which is cited, you know, that includes all that, all that stuff. And so, you know, what we're dealing with here is a completely different animal. But I thought it was your position, at least in part of your reply memo, that query whether Lara's is still good law after Iqbal. I do. I, I query whether that is still good law after Iqbal because, again, you're, you're, you're not dealing with personal participation. You're not dealing with someone's misconduct and you're not dealing with something that could possibly have caused the constitutional violation that's at issue. You're talking literally about a comment on an incident after the fact, after it's occurred, and after it's been completed in total. But you also distinguish Lara's. I interrupt you. I didn't mean to. Why don't you finish that point you were making? Right. Because, you know, Lara's is a, is a case that's replete with facts that actually touch on those other theories of liability. In Lara's you had, and I believe it was Chief Gates who, and the, the allegations and evidence were replete, you know, with condoning misconduct, not properly investigating misconduct, putting investigation of misconduct into the hands of the very people accused, and that it had created a series of preexisting constitutional violations similar to the ones that were being dealt with in the Lara's case itself. You have none of that here. You have no allegations that Sheriff Clark is running a law enforcement agency in the way that it was described in the Lara's case with, with Chief Gates. You literally have no, you know, preexisting instances that, that the sheriff is aware of that are anywhere close to that. I mean, frankly, they're not anywhere at all. Sir, would you talk for a moment about ratification as forming the basis for municipal liability versus individual liability? I mean, you spend some time on that in your, in your brief, and I'd just like to understand better. It also, that also probably relates to the pending jurisdiction issue, but for the moment, just discuss for me, if you would, your point there. Well, my point is that ratification evolved from the St. Louis case, and the second name in that case I can never pronounce correctly. It starts with a P. It starts with that, that case, and there is, you know, literally a, almost an oblique comment about ratification being a possible cornerstone for a municipal liability claim. And it's a, it's an interesting concept, because I'm not so sure ratification has, has evolved on a linear path. I think that ratification is sort of, has been a very clear, because what we find happening with ratification after St. Louis is that different courts are kind of, you know, mixing and matching different theories along with ratification. Is it failure to train? Is it a, is it custom and policy? Is the ratification evidence of a preexisting failure to train? But it has been fairly consistently applied as a basis of municipal, municipal policy throughout the years. There are what, what I would characterize as some one-off cases where the courts adopt it as a basis of individual liability, but they only seem to do that in conjunction with other preexisting recognized theories, some of the ones that we've talked about before. When Ashcroft v. Iqbal came along, I don't see how you square individual liability into ratification with the language in Iqbal. And this case doesn't need to, to, to come to this conclusion necessarily, but, but at that point, I don't think somebody in Sheriff Clark's position could say that, that ratification is, is a clear avenue of liability for an individual, even if it might be a clear avenue of liability for the municipality. How would you define, oh, excuse me, go ahead. No, Judge O'Scanlan, go right ahead. How would you define ratification and what, where do we go to find the definition? Well, I, I go to cases like Christie v. Ioppa and, and. Cases like? Christie v. Ioppa. Okay. And at Ninth Circuit case, and it talks about, about knowledge not being enough. It talks about acquiescence not being enough. But it also has that interesting language, and I don't think that it's a mistake by the court to have this language, that you're not only, you're not only condoning and encouraging that specific unconstitutional behavior, but you're doing it knowing what the basis is. And I think there's some importance to that language, because I think it requires much, much more than what we see in this complaint. So the quote from, I think it's from Monell, but in any event, the authorized policy makers approve a subordinate's decision and the basis for it. You're saying that's not what we have here. That's something different from ratification. You know, and even, even though it's, I admit it's a district court case, but we did cite the, the Meister case as a, as a example of how media statements, post-incident media statements were used in ratification on the municipal liability side. But, but Christie and Gillette and Meister all tell us that the speaker, the ratifier, needs to, needs to know that there's a constitutional violation, needs to know the basis of that constitutional violation, and then needs to, to express agreement with it in some way. And Meister, you know, concludes that post-incident media statements didn't do that. In this case, and I think it's really important to look at the facts because the facts are so important. There are allegations that Sheriff Clark reviewed the employment investigation. The district court jumps to the conclusion that he also reviewed the criminal investigation. But if you look closely at the allegations of the complaint, it never says that. So he looks at the employment investigation, and then he makes these general comments about both investigations, that facts are stubborn things, and I stand by what my people do, and I stand by what my criminal apprehension team does. There's no comment there in that generality and that breadth that can be brought back to the idea that he's commenting on a judicially deceptive warrant or affidavit in support of the warrant. There is literally no allegation in this complaint that he ever looked at the affidavit, much less looked at that affidavit and then went back to the criminal investigation and back to the employment investigation and did an analysis of things that were omitted that should have been in there, false things that were in there that shouldn't have been, and how that might have impacted under a Frank's analysis the viability of the warrant. Without those facts, there's no way that his basic general comments could ever fit the  I'm sorry. I want to reserve my time, but — Yes. Well, I won't take it away from you by this question, but on the pendent jurisdiction, and jumping off from what you were discussing about ratification, et cetera, finding the sheriff not individually liable doesn't preclude that the municipality may be liable through Detective Davis, does it, through Detective Davis and his — and the sheriff's statements. Well, yeah. Actually, those are two separate issues. So the answer to the question is that a finding that Sheriff Clark — Right. Well, let me couch it in the correct way. The finding that this complaint does not plausibly allege a constitutional claim against Sheriff Clark equates to a dismissal of Navajo County. And the reason is, and if you look at the district judge's prior order, his sole claim for municipal liability on the county was the alleged ratification by Sheriff Clark. The court's order makes clear, both his order on the first motion and on the second motion, that municipal liability as to the county is not based on anything that Detective Davis did. So we would have to reject the notion that ratification can ever lead to Monell liability? To — To the municipality being liable. Well, again — I mean, because there are cases that — or there are not, because you were talking about them — that say ratification of an act by someone in authority can lead to the municipality being liable. So my question to you is, would we have to reject that line of cases dealing with ratification as to Monell liability, as opposed to individual liability? Well, you could, but you don't have to for purposes of this case. Okay. Now, keep in mind that that ratification theory requires conduct by a final policymaker of the county. So it couldn't be, for example, ratification by Detective Davis in this case. So it really is limited to final policymaker action. So what I am saying is you don't have to disturb existing law on ratification as it relates to municipality. But if, in the context of your decision, you make the decision that Sheriff Clark, that no plausible constitutional violation exists on the face of this complaint as to Sheriff Clark, because that's the only avenue of liability that remains as to Navajo County, theoretically and logically, Navajo County would be required to be dismissed as well. Okay. And with your permission, Judge Baya, may we give him another minute or two for rebuttal because I took his time there? Sure. Thank you. Thank you very much. Go ahead. Good morning, and may it please the Court. My name is David Wood, and I represent the plaintiff and appellee, Tim Hunt. I'll start with one fundamental error in this appeal, which is, and you've heard it again today and it was peppered throughout the briefs, that this case is limited to I'm sorry, sir. Could you just raise your voice a bit? Okay. And maybe this will help as well. The fundamental error in this appeal is that the allegation that this is only an allegation in the complaint of post-incident ratification that's been peppered throughout the briefs, and you heard it again this morning in oral argument, that is not the case, and that was not the district court's findings. So even if you agree with appellee's arguments today, they are not subject to dismissal as they request as an order from this court. Beyond that, though, the entire argument boils down to the claim that the district court or this court is not allowed to actually assess a supervisor's words for their meaning. And that is a complete end-runaround, what is plausibly alleged in the complaint and reasonable inferences. So I really do want to hear that, but I was intrigued by what you said at the very beginning. Could you tell us what else there is in the district court decision that the district court relied on other than the post-incident statements? Certainly, Your Honor. I'm happy to. So if you look at ER page 4, 004, the district court's second order, it recites what we had alleged in the original complaint and the amended complaint, which were several Fourth Amendment violations. So the district court says, quote, Excuse me. Did you say ER 4? Yes, 004. That is the order? The second order, yes. Okay. And what part of the order are we looking at? Lines 23 through 26, Your Honor. Okay. And so that is where the court recites, which it found earlier that we had alleged and we did, that there were Fourth Amendment violations in the judicial deception in requesting the warrant, comma, the exclusion of material, exculpatory information, comma, and the execution of the warrant itself. So if you look at the district court's original order, and that's ER 88, and that's lines 10 through 26, that's where you will see the district court make a finding that Hunt's complaint includes a separate allegation under the same single Fourth Amendment claim that Davis committed an additional violation in procuring and executing a facially invalid warrant. And the district court ---- What does Clark have to do with that? Well, what Clark has to do with that is that ---- What allegations show that Clark knew the warrant was facially defective before it was executed? Two different, two different. One, before it's executed, and then his statements after. Before it's executed or during the execution, as we alleged, the detective recited that Sheriff Clark viewed the warrant as creating a golden case. So what that recites ---- The results of the search could ---- Right. Okay. But how does that tell us that Sheriff Clark knew not just about the warrant, but about the deficiencies in it? Well, again, that's the whole point. The point with what I'm saying with that is he doesn't need to know the deficiencies in the warrant affidavit because the warrant itself, as the district court found, was facially invalid based on the passage of time to procure any usable biological evidence. Well, how do you know the sheriff ever saw the warrant and read the warrant? The sheriff doesn't need to actually literally read the warrant because, again, the detective is assigned to the case in July for an alleged incident in January. So the sheriff necessarily knows that there is no biological ---- alleged biological evidence being collected from a public shower for six months. So he doesn't need to read the warrant to know that there is no probable cause supporting a collection of Mr. Hunt's DNA, his saliva, or creating a DNA profile because there could not be any usable evidence collected after that passage of time. So the district court additionally found that there was ---- the district court was finding that there was ratification, so this is going back to ER 8 at lines 9 to 10, that there was ratification in applying for, which would be the judicial deception, and executing the search warrant. There has never been a challenge to the district court's finding that there was a plausible claim of executing a facially invalid warrant. There still has never been one, and with regard to the claim that we are only talking about post-incident ratification, that ignores entirely that Detective Davis is, and again, we're at the pleading stage, so it's really just what's reasonably inferred, not what's proven. And that's why I want to talk a little bit about the attempts to distinguish from Larez and some of these other cases in a minute. But Detective Davis is reciting some form of knowledge prior to executing that warrant, some form of knowledge of the investigation by Sheriff Clark. You mean because he ---- I'm sorry, sir, I'm just ---- I have read everything carefully, but I'm having trouble following the facts you're giving us. You're saying that this is all because of his statement that what comes from the warrant, and on that you're inferring that he had seen the warrant and knew about it and knew what was in it? I'm inferring that the reasonable inference there is that Sheriff Clark is following and aware of the investigation. Generally. Generally, yes. Generally. Generally. But there's no ---- well, all right. Talk to me a bit about causal connection that opposing counsel raised. I mean, do you concede that by the time Sheriff Clark spoke, the subject affidavit ---- what is the causal connection between that statement and any injury to Hunt? Okay. Well, and I want to be very clear, because again ---- So in other words, let me just ---- I apologize. Let me just change this question. No, you don't have to apologize. By the time ---- sometimes we do. By the time Clark spoke, is it correct that the subject affidavit had been created and submitted and the warrant obtained and executed? Well, and that's why I want to be very clear with our extreme disagreement with the claim that we are talking about only post-incident ratification in this case. No, right now I'm just focusing on the statement, though. If that's all we had was the statement, am I correct that by the time of that the subject affidavit had been created, submitted, warrant obtained and searched on? Right. By the time of those two latter statements, that is correct, Your Honor. Yes. And what other earlier statements are there, other than those two latter statements? There's the earlier statement of Detective Davis discussing that Sheriff Clark has awareness of the investigation, has awareness of the warrant, because how else can the sheriff be making a statement that this will create a golden case if he is not following the investigation? Because the product of a warrant is meaningless unless you actually know the nature of the investigation. And again, we don't have to prove our case at this point. This is just what's reasonably inferred to demonstrate liability of Sheriff Clark. Now, I think I've gone off of the question where you wanted to go, Your Honor, which was where's the causation if we're talking about just the post-incident ratification? The causation is what's evidenced by the post-incident ratification. His words by themselves, they can't create causation, but they can evidence causation, and that is standard and established law in this circuit and, frankly, other circuits that demonstrate that there was a custom, that they demonstrate that there was knowledge, and that's what juries actually do every day. So Sheriff Clark can make whatever claims he wants. And I apologize, the sheriff. He can make whatever claims he wants to about the meaning of those statements, but what they're ignoring here is that he didn't just generally praise an investigation, and we absolutely have alleged that he reviewed the entire criminal investigation, including the warrant and the affidavit, when he made those statements, because what you didn't hear from counsel this morning is he said, everybody go get the public records and see for yourselves. Under Arizona law, the public records are the criminal investigation file, the same file that we reviewed, and that's where the allegations in the complaint come from. So with regard to that, he did review the criminal investigation file, and he doesn't need to be alerted to a constitutional violation when, if you look at the allegations in the complaint of that incredible litany of false statements. Kagan, I have to press you on this. That's fine. You're getting this from the fact that generally he reviewed the investigation. You have not alleged that he looked at that affidavit before it was submitted or even before he gave his statement. Is there in your complaint? There is not an allegation that he reviewed the affidavit prior to it submitting.  Okay. There is an allegation that he had reviewed the substance of the warrant and the investigation. Because he said at least what you were looking for, because he said it could be gold. Yeah. I understand that. Now, let me ask you, was there any allegation? There's no allegation in your complaint, is there? And I have, you know, read it carefully. Suggesting Clark's alleged public comments were directed at the warrant or the supporting affidavit, or that he was talking about it when he said the statements, the post-incident statements that you're relying on? That is our allegation. And I would submit, Your Honor, that to say that he needs to confess is asking too much when he is talking about the entire substance of that file. Because if we hold somebody to the – well, and what I mean also is specifically this part of it, then we are basically insulating supervisors from their responsibility to be critical when they're reviewing an entire investigative file. And when he says public records, it is a reasonable inference that it is the entire investigative file, which includes that affidavit and warrant. Sir, is there any allegation that the propriety of the warrant or the underlying affidavit had been challenged when Sheriff Clark made his statement? That we are aware of? No. No. No. But the thing is, there is no requirement that it be challenged for the propriety, because, again, a law enforcement office – So I was just getting at the context of the statement that was made. Right. Right. But, again, when you look at the allegations in the complaint, the same public records that demonstrate all of these falsities and all of these material misstatements and omissions, and even the facial validity, are the things that he's reviewing. So there's a very serious problem if we say that, well, they should be allowed to praise when what they're praising includes such obvious unconstitutional conduct. I know you wanted to talk about Lares, and I took you off that track. Why don't you go back to that? That seemed like a very different case from this one. So why don't you talk about Lares and how you think it is helpful to you? Right. And so I think that this is actually continuing a theme from what's happened in the district court. And that's where, as we pointed out in our responses, we kept being challenged with a motion for summary judgment standard. Where's your evidence? Where's your proof? We're not at this stage yet. And so when you look at the reply brief in this case, they keep talking about facts being night and day. There's no requirement that we meet what's sufficient to substantiate a jury verdict at this stage. No, but you cited Lares in support. Did you not? I did, and it does support. Oh, yeah. So I'm just asking how does it support you? Oh, sorry. Sorry. I just wanted to point out that we don't have to meet the same facts, and especially not under a different standard of review. But what it supports is that the statements after the fact can evidence what was your custom that led to the constitutional violations. Are you talking about the midtrial public statements by the sheriff that were allowed into evidence? Is that the part of Lares you're relying on or something else? If I'm remembering correctly, he made statements, I think, both midtrial and after the fact. And if my memory serves me correctly, the panel in that case relied on both and referred to them as post-incident ratification. And, in fact, actually, I do believe he made statements to the press after the trial even. But, again, it's still post-incident, and it can serve as evidence of what your And the district court in this case cited the same cases. And I would like to point out, you were recited to ER 007 and 8 for the claim that the district court in this case rejected a finding of any policy or custom in total. That's not what the district court did in this case. The district court took our other alleged incidents unrelated to Mr. Hunt and said that those did not establish a standalone policy or custom. The district court said nothing about, well, in ratification, I'm not making that finding. I think in Lares, I was just looking at my notes, the chief had sent a letter. There had been a search and then a complaint to the LAPD, and the chief had sent a letter stating that none of the allegations of the people complaining were sustainable. So that's probably what you're referring to about one piece of evidence. Among a lot, there were expert witnesses. And I should say, this was a jury trial verdict that was up on appeal. So that's what you were referring to. And I know mid-trial, there were some statements, and I think they admitted into evidence. It was more of an evidentiary issue, was it not? That's correct. So, Your Honor, I would actually, I have about ten seconds. If I have permission to go over by about 15, I want to refer to one case not cited in the briefs. And that's actually yours, Your Honor, in the case Plouffe, P-L-O-U-F-F-E. And that was your summary judgment ruling and ruling on a couple of other matters, where you recited what is established in this case, which is, is there anything showing that a supervisor's assertion could be found to have communicated a message of approval to the offending subordinate at the time? And that's why I wanted to bring to your attention so much that Did you file a 28-J letter? Oh, I apologize. I have the feeling that my colleagues were probably not interested in that, sir, nor am I at this point. It's very old, probably pre-Iqbal, actually. Well, and thank you. Okay, thank you. Thank you. I appreciate the additional time, and I'll try to make it snappy. On the idea of whether this case is focused on post-incident ratification only, the district court's order at ER 9 and 10 says this, Plaintiff Timothy Hunt's amended complaint includes well-pled non-conclusory facts, plausibly suggesting that Sheriff Kelly Clark ratified the allegedly unconstitutional actions of Detective Asher Davis. Accordingly, Hunt has stated a claim against both Sheriff Clark and Navajo County on this basis alone. No question that this is only about post-incident ratification. Now, counsel in his argument seems to be arguing from facts that aren't even alleged in the complaint, and that's a problem. I'm not aware of any case law that suggests that qualified immunity, even at the motion to dismiss stage, should be analyzed based on allegations that you could have made but didn't. If counsel had facts to suggest that Sheriff Clark had reviewed the affidavit and done the Frank's analysis of that affidavit prior to making a statement, he could have put those in the complaint, and he did not do so, and they cannot be argued at this stage of the game. And the allegations of this complaint, when you cut through the exaggeration and the sophistry, at paragraph 47, Sheriff Clark reviewed the employment separation information. Fifty-two, he reviewed the employment investigation. Paragraph shortly after that, he was the recipient and reviewer of the employment investigation. Then it goes all the way to page 40, doc 40, page 22. Then he makes his public statements. There's no review of the affidavit. There's no review of the criminal case. It's not alleged in this complaint. And thank you for my time. Thank you very much. First, thanks both counsel for their argument. And the case of Hunt v. Clark is submitted. And we stand in recess until tomorrow at 9 a.m.
judges: O'scannlain, Bea, McLaughlin